# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0725-25

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

C.L.T.,

     Defendant,

and

R.W.W.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.M.W.,
a minor.

_____

Submitted August 11, 2026 – Decided August 14, 2026

Before Judges Mawla and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FG-03-15-0025.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Lakshmi R. Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor N.M.W. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant R.W.W.[1] appeals from an October 8, 2025 judgment awarding the Division of Child Protection and Permanency (Division) guardianship of his son, N.M.W., and terminating R.W.W.'s and C.L.T.'s[2] parental rights. We affirm.

Judge Mary Ann C. O'Brien tried this matter over the course of three days in September 2025. She considered the testimony of three witnesses on behalf

---

[1] We use initials pursuant to Rule 1:38-3(d)(12).

[2] C.L.T. is the child's mother. She has not appealed from the judgment.

of the Division, namely: a Division caseworker; N.M.W.'s relative resource mother, and the Division's clinical and forensic psychology expert. The Law Guardian also presented testimony from an expert in clinical and forensic psychology. Thirty exhibits were admitted into evidence, including twenty-eight from the Division and two from the Law Guardian. Neither parent appeared nor adduced any testimony or evidence at trial.

The evidence relied upon by the judge, which we summarize here, was essentially unrebutted. It showed both parents suffered from substance abuse issues, criminality, and domestic violence. C.L.T. also had mental health problems. She had a child from a different relationship who had been removed from her care years prior.

The Division received its first referral when N.M.W. was born in December 2023. N.M.W. had drugs in his system, specifically cocaine and marijuana. The child was placed with R.W.W., but this was short-lived because R.W.W. was incarcerated, resulting in the first removal. N.M.W. returned to R.W.W.'s care after he was released.

In February 2024, less than a month later, the Division received a second referral due to an incident of domestic violence between R.W.W. and C.L.T. where R.W.W. choked C.L.T. as she held N.M.W. As a result, R.W.W. was

once again incarcerated and the Division removed N.M.W. for a second time. Following each removal, the Division placed N.M.W. with the same relative resource family. He has been in this placement since the second removal.

The Division afforded both parents: visitation; parenting classes; and transportation to visits throughout the guardianship proceedings. They failed to consistently see N.M.W., attending visits at most fifty percent of the time. The last time they saw N.M.W. was in February 2025.

The Division offered both parents a multitude of services to help with reunification, including: substance abuse treatment and evaluations; mental health treatment, programs, and evaluations; housing assistance; drug screens; and transportation. They failed to comply with virtually every service provided, especially the drug screens. R.W.W. shaved all his body hair so he could not complete a hair follicle drug test. When the parents did comply with screening, they tested positive for drugs. R.W.W. tested positive for cocaine and marijuana and admitted to previously using four-to-five bags of fentanyl per day.

The parents lacked stable housing, despite the Division's efforts to assist by providing housing vouchers. They lived in a tent behind a fast-food restaurant. Neither was employed.

A-0725-25

The Division filed the guardianship complaint on February 14, 2025. Three days later, R.W.W. was arrested for a domestic violence incident in which he stabbed C.L.T. in the hand with a screwdriver. In March 2025, R.W.W. was arrested for burglary and ultimately received probation. He was also ordered to complete substance abuse treatment. The February 2025 domestic violence incident led to a guilty plea and R.W.W.'s incarceration for several months. R.W.W. was released in mid-June 2025 but did not inform the Division of his release until August 2025. When R.W.W. submitted to a psychological evaluation, he refused to comply with the follow-up recommendations.

In the meantime, N.M.W. was thriving in his placement. The resource parents had a large immediate and extended family who showed affection for N.M.W. and vice versa. The relative resource mother gave detailed testimony about this and other aspects of N.M.W.'s relationship with her family. She and her husband had previously adopted two of N.M.W.'s cousins and wanted to adopt N.M.W. Her testimony was corroborated by the: Division's records; caseworker's testimony; and bonding evaluations performed by both experts.

The caseworker testified about her discussion with the resource parents regarding the differences between kinship legal guardianship (KLG) and adoption. The Division adduced into evidence an "Acknowledgment of Receipt

of Adoption/KLG Comparison Chart," which the resource mother executed on May 3, 2024, acknowledging she had a discussion with the Division about the information it shared with her regarding the differences between adoption and KLG processes. Over sixteen months later, the resource mother testified she and her husband still wanted to adopt N.M.W. to keep him in the family and in "a stable, steady home," which KLG could not provide.

R.W.W. continued not to comply with the services offered by the Division, including refusing to submit to a bonding evaluation with the Division's expert. The bonding evaluation between N.M.W. and the resource parents revealed a healthy bond, and they could mitigate any harm resulting from severing the parental relationship with R.W.W. The expert opined the biological parents' failure to comply with services itself, put N.M.W. at risk of harm. The Law Guardian's expert reached similar conclusions.

After recounting the relevant facts, the judge made detailed credibility findings. She found the caseworker and the resource parent credible, the Division's expert "very credible," and the Law Guardian's expert "extremely credible."

The judge concluded the Division proved all four statutory best interests prongs under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Prongs

6

one and two were proved because in addition to the causes for both removals, R.W.W.'s:    substance abuse; failure to comply with services and recommendations; perpetration of domestic violence in N.M.W.'s presence and failure to address the domestic violence; failure to attend visitation; ongoing criminality; lack of housing and employment; and failure to stay in contact with the Division, had harmed and would continue to harm N.M.W.   The evidence showed R.W.W. was both unwilling and unable to eliminate these harms to provide N.M.W. with a safe and stable home.   The judge observed a further delay in placement would add to the harm to N.M.W.

The judge found the Division proved prong three because it made "extensive and reasonable efforts" and provided "a wide range of services designed to support reunification."   These included:   screenings, evaluations, and treatment; classes; programs; housing assistance; and transportation, which neither parent took advantage of.

The Division also proved it explored alternatives to the termination of parental rights.   Neither parent objected to N.M.W.'s placement with relatives. The testimony clearly showed the Division discussed and educated the resource parents on the differences between adoption and KLG.   The resource mother's testimony "made it clear that she preferred to adopt" N.M.W.

A-0725-25

Prong four was proved because a termination of parental rights followed by adoption would "solidify the only stable, nurturing environment [N.M.W.] has ever known and insulate him from the very real risks [posed] by reunification." The expert testimony established N.M.W. had "formed a strong, secure attachment to his resource parents who have provided him with stability, love, and safety." The resource parents were not only relatives but had cared for N.M.W. most of his life. They "consistently meet his developmental needs and provide him with a safe home. Removing [N.M.W.] from his resource parents . . . would inflict significant harm, disrupting the psychological sense of safety and permanency that supports healthy attachment and long-term development."

In contrast, the record lacked evidence of anything other than "a weak bond" between N.M.W. and his parents. Even if the termination of parental rights severed their bond, the judge concluded the resource parents could mitigate the harm to N.M.W. A termination followed by adoption was in N.M.W.'s best interests because "both experts opined that permanence through adoption would bring stability, predictability, and [the] security necessary for [his] healthy growth while shielding him from the demonstrable dangers of [his] parents'] substance [ab]use, mental health, and personal instability."

A-0725-25

I.

R.W.W. challenges the judge's findings under each best interests prong. He asserts prong one was not proven because the Division presented no evidence N.M.W. was harmed by him. R.W.W. never used drugs in N.M.W.'s presence and although the child witnessed domestic violence, it did not harm him. The judge presumed harm by R.W.W.'s failure to care for him. R.W.W. asserts his incarceration was not grounds to find harm because he was released from incarceration before trial. Harm was not shown by virtue of R.W.W.'s criminal history, poverty, or homelessness because the evidence failed to tie these things to conduct showing a risk of harm to N.M.W.

R.W.W. asserts the findings under the second prong were erroneous because the judge gave insufficient weight to the fact R.W.W.'s visits with N.M.W. went well and he demonstrated appropriate parenting during the visits. Even though the experts concluded R.W.W. could not care for N.M.W., they never opined that continued contact between father and son was a harm. Further, the judge gave inordinate weight to R.W.W.'s drug relapses and the domestic violence, even though "there was no evidence these were serious issues" because C.L.T. never filed a criminal or domestic violence complaint. And the judge

should have understood the lack of housing made it hard for R.W.W. to comply with services

R.W.W. asserts the judge's prong three findings were erroneous because the Division did nothing to support him. The Division failed to provide sufficient visitation, including during his incarceration, and used the domestic violence allegations as a means to limit visitation. The services offered by the Division were not intended for reunification or tailored to R.W.W.'s needs but instead designed to help the Division prove its case. The judge's findings the Division considered alternatives to the termination of parental rights were based on outdated legal standards preferring a resource parent's desire to adopt over KLG.

R.W.W. asserts there was insufficient evidence to prove prong four. The judge's findings a termination of parental rights would not do more harm than good ignored the fact visitation went well and that there was no bonding evaluation between R.W.W. and N.M.W. to prove they lacked a bond. The judge also placed inordinate weight on the fact the resource family were relatives.

II.

Our scope of review of a judgment terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will

A-0725-25

uphold a trial judge's fact findings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). Our deference is owed to the judge's credibility determinations "based upon [their] opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to a judge's interpretation of the law, which we review de novo. N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

The best interests of the child standard is codified in N.J.S.A. 30:4C-15.1(a), and requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). Put another way, the trial judge must "consider the totality of the circumstances in deciding whether to terminate parental rights." N.J. Div. of Child Prot. & Perm. v. D.C.A., 256 N.J. 5, 17 (2023).

The definition of a harm affecting the best interests of children under N.J.S.A. 30:4C-15.1(a)(1), and by corollary (2), is broad. "[A] parent's inability to provide care is harmful and can endanger the health of a child." N.J. Div. of Child Prot. & Perm. v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018). Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . constitutes a parental harm to that child arising out of the parental relationship and [is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." In re Guardianship of DMH, 161 N.J. 365, 380-81 (1999).

Exposing a child to domestic violence is a form of harm. See N.J. Div. of Child Prot. & Perm. v. N.T., 445 N.J. Super. 478, 491 (App. Div. 2016). "[T]he

12

best interests standard does not concentrate on a single or isolated harm or past harm as such. Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

"[T]he attention and concern of a caring family is 'the most precious of all resources.'" DMH, 161 N.J. at 379 (quoting N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 613 (1986)). Therefore, "[a] parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid. "[A] delay in establishing a stable and permanent home" is also a harm. Id. at 383.

The Division must show the alleged harm "threatens the child's health and will likely have continuing deleterious effects on the child." K.H.O., 161 N.J. at 352; see N.J.S.A. 30:4C-15.1(a)(1). In other words, the Division does not have to wait "until a child is actually irreparably impaired by parental inattention or neglect." DMH, 161 N.J. at 383.

Pursuant to N.J.S.A. 30:4C-15.1(c), "reasonable efforts" means "attempts by . . . the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family

13

structure."  A court's "evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis."  DMH, 161 N.J. at 390.  "'Reasonable efforts' will vary depending upon the circumstances of [a child's] removal."  N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007).  The Division must focus on reunification, and the services utilized to facilitate this "must be 'coordinated'" and have a "'realistic potential' to succeed."  N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)).  Nevertheless, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success," DMH, 161 N.J. at 393, particularly where the lack thereof is due to a parent's "failure to cooperate or follow through" with services and obligations, N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

N.J.S.A. 30:4C-15.1(a)(4) "serves as a fail-safe against termination even where the remaining standards have been met."  N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008) (quoting G.L., 191 N.J. at 609).  "The question ultimately is not whether a biological mother or father is a worthy

parent, but whether a child's interest[s] will best be served by completely terminating the child's relationship with that parent." Ibid.

"Our courts have recognized that a child's relationship with a parent is of such significance that doubts are to be resolved against its destruction." N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 264 (App. Div. 2005) (quoting In re Guardianship of J.E.D., 217 N.J. Super. 1, 16 (App. Div. 1987)). "It also is widely understood that a 'child deeply needs association with a nurturing adult' and that 'permanence in itself is an important part of that nurture.'" E.P., 196 N.J. at 108 (quoting A.W., 103 N.J. at 610). N.J.S.A. 30:4C-15.1(a)(4) is satisfied "where it is shown that the bond with [the resource] parents is strong and, in comparison, the bond with the natural parent is not as strong." K.H.O., 161 N.J. at 363.

The Division "should offer testimony of a 'well[-]qualified expert who has had [a] full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with both the natural parents and the [resource] parents." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). Although prong four typically requires expert testimony based on a comparison of bonding evaluations, New Jersey Division of Youth & Family Services v. A.R., 405 N.J.

Super. 418, 436-37 (App. Div. 2009), they are not required where termination "[is] not predicated upon bonding, but rather reflect[s] [the child]'s need for permanency and [the parent]'s inability to care for [the child] in the foreseeable future," New Jersey Division of Youth & Family Services v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996).

Having considered the record pursuant to these principles, we affirm substantially for the reasons expressed in Judge O'Brien's thorough and well-reasoned oral opinion. We add the following comments.

We reject the challenges to the judge's finding of harm under prongs one and two. It is plainly obvious R.W.W. had harmed and would continue to harm N.M.W. R.W.W.'s brief misses the proverbial forest for the trees by attempting to separate and contest the myriad ways he harmed N.M.W., ignoring the overall impact his acts and omissions had on his son. The totality of the circumstances amply support the finding of harm, including R.W.W.'s: criminality and domestic violence; unaddressed drug use, housing, and employment issues; and his disinterest in seeing, let alone parenting, N.M.W.

R.W.W.'s challenge to the judge's prong three findings is unavailing. The Division provided R.W.W. with services aimed at addressing his unique problems and achieving reunification, of which he failed to take advantage.

16

We are also unconvinced by the claim the resource mother did not understand the differences between KLG and adoption. R.W.W.'s counsel cross-examined the resource mother on the procedural intricacies of KLG-related motion practice. The resource mother testified she did not know she had to be given notice before a KLG could be vacated. But like R.W.W.'s arguments related to an alleged lack of harm, his argument the resource mother did not know KLG was an option ignores the broader context. She testified the Division talked to her on numerous occasions about the KLG and adoption processes. Her adoption of other relatives only underscores the fact she knew the difference between KLG and adoption.

Finally, we decline to disturb the judge's prong four findings a termination of parental rights would not do more harm than good. R.W.W. falsely equates his refusal to submit to a bonding evaluation with the Division having failed to disprove he had a bond with N.M.W. The failure to adduce a comparative bonding evaluation was solely the product of R.W.W.'s refusal to cooperate with services. Regardless, neither the expert testimony nor the judge's prong four findings was exclusively predicated on the bonding evaluations. The substantial credible evidence in the record showed a termination would not do more harm

17

than good because N.M.W. was entitled permanency and his biological parents were either incapable of or unwilling to provide it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

18